# No. 25-50976

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

**United States of America**,
Plaintiff-Appellant,

v.

**James Wesley Burger**,
Defendant-Appellee.

On Appeal from the United States District Court
for the Western District of Texas

**Emergency Motion to Vacate Order Releasing Defendant Pending Appeal**

Defendant James Wesley Burger was indicted for transmitting threats interstate in violation of 18 U.S.C. § 875(c) after he announced online that he would "attain martyrdom" at a "music festival [a]ttracting bounties of Christians" on a specific date. When the district court dismissed the indictment and ordered him released unconditionally, the government immediately appealed and moved to stay the dismissal and release orders. This Court granted an administrative stay. But the district court again ordered Burger released without supervision and without addressing any of the evidence a magistrate judge relied on in finding Burger's release endangered community safety. The government moves this Court under Federal Rule of Appellate Procedure 9(a) to vacate the district court's new release order and to direct that Burger be detained pending a reopened detention hearing under 18 U.S.C. § 3142(f).

## Nature of Emergency

Even after this Court administratively stayed the district court's previous release decision, the district court ordered released—unconditionally—a defendant who

- according to his own counsel, "requires supervision" and "monitoring," Att. R at 64:18-20 (Det. Hr'g Tr.)[1];

- according to his own counsel, has an "adolescent attraction to the idea of martyrdom," Opp'n to Stay Mot. 11, ECF No. 22;

- threatened earlier this year to "attain martyrdom" at a Christian music festival and to "[d]etonate . . . munitions" and "use [his] firearms . . . on the path of martyrdom" if approached by law enforcement, Att. D at 11; Att. Q at 6-10; and

- while in state custody earlier this year, carried plans to make a bomb "that will turn nails, nuts and bolts into <u>active</u> shrapnel," Att. D at 17-19 (emphasis in original)—plans that an agent testified could potentially result in a destructive device, Att. R at 27:13-20.

Releasing Burger unconditionally and without any form of supervision pending appeal presents an intolerable risk that justifies this Court's emergency intervention. The government seeks a ruling as soon as possible and no later than December 20, 2025, when the current administrative stay expires. *See* Order, ECF No. 41-1.

---

[1] Relevant parts of the record are attached to this motion as Attachments A through Y. *See* <u>Fed. R. App. P. 9(a)(1)</u>.

## Background

### I.   Burger threatened to attack a Christian music concert and law enforcement.

This case arises from threats Burger, then a high school senior living in a suburb of Austin, Texas, issued in an online platform called Roblox. Roblox allows users to create online environments called "experiences"—often games, but sometimes more like chatrooms—that they and other users can populate through online avatars. Burger issued his threats using avatars "Ghurabahh" and "Crazz3pain" in a Roblox environment called "Church." Roblox users reported some of Burger's threats, which they saw as a series of transient messages that appeared above his avatars' heads for ten seconds. Law enforcement captured Burger's other statements in Roblox through a keystroke logger his uncle installed on the computer Burger used after becoming concerned about Burger's behavior. The government obtained evidence that Burger intentionally used Roblox for his communications because he believed it was less likely to be monitored and because law enforcement would not take seriously any statements made on that platform.

On January 21, 2025, after saying he was going to donate funds to the Islamic State using Bitcoin, Burger—using the avatar Ghurabahh— stated:

> Yes I have guns
> Incase the authorities
> Want to arrest me

Att. Q (Gov't Trial Ex. 3) at 2-3. When another avatar asked, "[W]hat are you gonna do if they try?" Burger responded:

> I am ready
> To sacrifice my life
> For my Rabb
> Detonate what I've prepared
> Of munitions
> And use my firearms
> To take many with me
> Yes wish me luck
> On the path of martyrdom
> In'shaa'allah

*Id.* at 6-10. An experienced Roblox user in Pennsylvania saw this statement, believed it to be a threat—as opposed to "trolling" (deliberate provocation) or role-playing, and reported it to the FBI.

On January 23 and 27, 2025, Burger made statements on Roblox indicating that he was planning to attack a Christian music concert or festival, kill or injure the Christians, and seek or achieve martyrdom. On January 23, when a Roblox user asked, "[H]ow many days until you do thay [sic]?" Burger—using the avatar Crazz3pain— responded:

> It will be months
> Shawwal
> April
> It will be a glorious wound
> Upon their capitol
> And deal a grievous wound upon the followers of the Cross

Att. D (Detention Hr'g Exs.) at 2-5. The other user responded, "Akhi, we will make dua for u once u martyr," "I[']ll keep you in my prayers," and "InshaAllah ill follow after you." *Id.* at 5-6. Burger then replied,

> I cannot confirm anything aloud at the moment
> But things are in motion

*Id.* at 6. When the other user turned to another avatar and said, "ALI MY BROTHER IS ABOUT TO DO HIS ATTACK," Crazz3pain responded, "Don't delay yourselves too long brothers, Jannah [heaven] awaits us." *Id.* at 7-8. An experienced Roblox user in Nevada saw this exchange and believed it to be a threat as opposed to trolling or role-playing. That witness also reported statements by Crazz3pain not captured in screenshots, including that Crazz3pain would do something at a Christian music concert and become a martyr; that he would punish worshippers of the cross; and that another user could check Discord, an online-communication platform, to see photographs of the guns Crazz3pain planned to use in the attacks.

On January 27, a keystroke logger on the computer Burger was using indicates that he (as Crazz3pain), stated

> I've come to conclude it will befall the 12 of Shawwal aa
> And it will be a music festival
> Attracting bounties of Christians
> In'shaa'allah we will attain martyrdom
> And deal a grievous wound upon the followers of the Cross
> Pray for me and enjoin yourself to martyrdom

*Id.* at 11 (line breaks added for readability). As Burger's earlier statement clarifies, "the 12 of Shawwal" means April 12, and there was a prominent Christian concert scheduled for April 12, 2025, in Austin. The government anticipates presenting trial evidence, based on witness testimony and examination of Burger's electronics, that Burger visited the website for LiveNation, the concert promoter, before and after January 27. *Id.* at 14. Based on examination of

Burger's phone, witnesses will testify Burger searched for "Festivals happening near me."

The government also uncovered other concerning messages from Burger before and after the charged threats. In an online post on 4-chan viewed by an FBI employee in March 2024, Burger said that his highest ambition was to be a successful serial killer. In July 2024, he typed—in a message captured by the keystroke logger—that he wanted to attack the Austin Police Department and pledged allegiance to the head of the Islamic State. In a December 2024 Discord chat, he gave a user in Russia suggestions about how to make a bomb. Att. S (Mot. Hr'g Tr.) at 35:5-11. In February 2025, the keylogger captured Burger typing, "We're getting our knives sharpened for your throats." Around the same time, Burger stated that he wanted to perpetrate a stabbing attack like a "friend" in Europe and that he was willing to sacrifice himself "in a blaze of iron and metal…raining bullets upon disbelievers and their soldiers/police." Burger also had access to guns owned by his uncle and took and shared one or more pictures of himself with those guns, including sharing one with the person with whom he was discussing his planned attack on the Christian concert. Att. D at 12-13.

Burger was arrested on state charges on February 28, 2025. While in state custody after his arrest, he wrote down plans to make a bomb and a list of terrorist attacks. Att. D at 16-17, 26. At the end of the list of terrorist attacks, he added the notation "JeSuisISIS"—"I am ISIS." Att. D at 26; Att. R at 29:5-14.

II.  **A magistrate judge ordered Burger detained because he presented a risk of flight and a danger to community safety that no condition or combination of conditions could address.**

In May 2025, Burger was transferred into federal custody pursuant to a federal complaint. Att. A (Compl.). The government sought pretrial detention because of the risk he would flee and the danger he presented to the community. Att. B (Mot. to Detain).

A magistrate judge held a contested detention hearing. Att. R; *see* 18 U.S.C. § 3142(f). An FBI agent testified. *Id.* at 5:5-8. The agent recounted Burger's threats, *id.* at 7:21-20:18; the discovery of Burger's internet searches for nearby festivals and photos of Burger posing with firearms, *id.* at 20:22-21:2, 24:10-25:14; the decision by Burger's uncle to remove firearms from his home because of Burger's behavior, *id.* at 21:3-14; and the discovery of Burger's bomb-making notes and list of terrorist attacks, *id.* at 26:7-29:20. In argument after the testimony, Burger's own counsel argued against detention but conceded that he "requires supervision" and "monitoring." *Id.* at 64:18-20.

At the end of the hearing, the magistrate judge ordered Burger "detained until this case is concluded." *Id.* at 68:16-17; *see* 18 U.S.C. § 3142(e). The magistrate judge had "no doubt" that Burger was "prepared to execute" an attack. *Id.* at 69:7-9. The magistrate judge also issued a written detention order laying out his findings. Att. C; *see* 18 U.S.C. § 3142(g), (i). Burger did not ask the district court to review this order.

### III.  A federal grand jury indicted Burger, but the district court dismissed the indictment a week before trial and ordered Burger released.

A federal grand jury charged Burger with two counts of violating 18 U.S.C. § 875(c), which makes it a federal crime to "transmit[] in interstate or foreign commerce any communication containing . . . any threat to injure the person of another." Count One covered Burger's statements on January 23, 2025, and Count Two covered Burger's statements on January 27, 2025. In a superseding indictment, another grand jury added Count Three, which covered Burger's statements on January 21, 2025. Att. E (Superseding Indictment). He pleaded not guilty.

Burger moved to dismiss the indictment pretrial under Federal Rule of Criminal Procedure 12(b)(1). Att. F (Def. Mot. to Dismiss). He argued that the indictment sought to punish him for protected First Amendment expression because his statements were not constitutionally unprotected true threats. *Id.* at 17. The district court held hearings on the motion to dismiss the indictment on November 18 and 24, 2025. Att. S (Mot. Hr'g Tr.); Att. T (Status Conf. Tr.). At the end of the second hearing, the district court orally granted the motion to dismiss. About one hour after the hearing, the government moved to stay the dismissal order until after the issuance of a written order. Att. K (U.S. Mot. to Stay).[2] The defense opposed a stay, *see* Att. L, and the government provided a

---

[2] The defense faulted the government for not orally requesting a stay at the conclusion of the hearing. Att. L (Def. Resp. to Mot. to Stay) at 1. Although the prosecutor, responding to a question from the court, stated that the effect of the court's oral pronouncements would be Burger's release, the government did not waive or agree not to seek a stay of the court's order. The government objected to the court's rulings at the hearing and requested a stay immediately after the hearing. Att. T (Status Conf. Tr.) at 36:21-37:3.

brief in support of its position the next day, *see* Att. M. On November 25, 2025, the court denied a stay. Att. N (Order). Without mentioning the factors cited by the magistrate judge in detaining Burger or the government's brief in support of a stay, the court stated that the government had failed to show that a stay was warranted or that Burger poses a danger to the community. *Id.* On November 26, 2025, the district court issued a written order dismissing the indictment. Att. O. The order offered no reasoning for the dismissal but said a memorandum would be "forthcoming." *Id.*[3] The government immediately appealed. Att. P. Meanwhile, Burger was released unconditionally.

## IV. After this Court administratively stayed the district court's first order releasing Burger unconditionally, the district court again ordered Burger released unconditionally.

The same day Burger was released on the district court's order, the government appealed and filed an emergency motion in this Court to stay the district court's dismissal and release orders. Emergency Mot. to Stay, ECF No. 12-1. The government noted that if this Court stayed the district court's orders, the district court could consider whether detention would be necessary or whether to release Burger under supervision pending appeal. *Id.* at 15 (citing 18 U.S.C. §§ 3142, 3143). This Court administratively stayed the dismissal and release orders for ten days

> to give the district court time to: (1) provide its reasons for dismissing the superseding indictment against James Wesley Burger and

---

[3] Over two weeks after it dismissed the indictment, and about a week after this Court directed it to provide its reasons, the district court did so. Att. Y. This Court has directed the parties to submit supplemental briefing on that order by Monday, December 15.

> ordering him released from custody, Fed. R. Crim. P. 12(d); and (2)
> provide this court with a transcript of Burger's detention hearing and
> the motions hearings in this case.

Order, ECF No. 28-1. Consistent with the government's position, this Court provided that the stay did "not affect any relief that the district court may provide pursuant to 18 U.S.C. § 3143." *Id.*

The government moved immediately for a hearing on whether to detain Burger or release him on conditions. Att. U (U.S. Mot. for Hr'g). Burger responded by moving for release on personal recognizance without a hearing. Att. V (Def. Mot. for Release). In that motion, his counsel asserted that he "has no firearms, weapons, or munitions" and "does not pose a danger." *Id.* at 2. The government opposed his motion, reiterated the evidence presented at Burger's detention hearing, and explained that it would present additional evidence, including evidence that Burger had been preparing for an attack when he was arrested. Att. W (U.S. Opp'n to Mot. for Release).

The district court granted Burger's motion and denied the government's. Att. X. The court started by stating incorrectly that the government "made no objection" when the court "stated its intention to have Burger released following the dismissal of the indictment." *Id.* at 1. *But see* Att. T at 36:21-37:1. Citing this Court's statement that its stay did "not affect any relief the district court may provide pursuant to 18 U.S.C. § 3143," the district court determined that the cross-reference in § 3143(c) to § 3142 meant it could release Burger on personal recognizance under § 3142(b). Att. X at 1-2. Without addressing the evidence presented to the magistrate judge, the magistrate judge's findings or

order, or the additional evidence proffered in the government's opposition to release, the court stated that Burger "poses no flight or safety risk" and that the government "raise[d] no facts that suggest otherwise." *Id.* at 2.

The government filed a new notice of appeal from the second release order and now moves to vacate it.[4]

## Standard of Review

In an appeal of a district court's pretrial-release order, this Court asks "whether the evidence as a whole supports the conclusions of the proceedings below." *United States v. Rueben*, 974 F.2d 580, 586 (5th Cir. 1992). Although this standard is "deferential," this Court will vacate a release order that "simply is not supported by the proceedings below." *Id.* at 586-87. This standard "is akin to abuse of discretion." *Id.* "A district court by definition abuses its discretion when it makes an error of law or applies an incorrect legal standard." *United States v. Cabello*, No. 25-40482, 2025 WL 2738463, at *1 (5th Cir. Sept. 23, 2025) (quoting *Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468, 474 (5th Cir. 2011)). A district court also abuses its discretion if it bases its decision on a clearly erroneous assessment of the evidence. *United States v. Carpenter*, 140 F.4th 733, 740 (5th Cir. 2025).

---

[4] In the interest of time, and to avoid further complicating the procedural posture of these appeals, the government has not moved separately to stay the district court's second release order. Instead, because this Court "must promptly determine" whether that second release order can stand, Fed. R. App. P. 9(a)(2), addressing the second release order in conjunction with an emergency ruling on the already-pending motion to stay the first release order is most efficient. If this Court believes a second stay motion is necessary, the government will promptly file one.

## Argument

The evidence as a whole does not support the district court's order unconditionally releasing Burger on personal recognizance. As in *Reuben*, 974 F.2d at 586, an unconditional release order "simply is not supported by the proceedings below." The order does not acknowledge, much less address, the evidence supporting the magistrate judge's finding that Burger poses a risk to public safety. Nor does it address the concession by Burger's counsel that he needs supervision. Instead, the order hinges on clearly erroneous findings not supported even by the unsworn assertions by defense counsel the district court cited. The district court also erred procedurally—first, by improperly circumventing the requirement in § 3142 that a detention hearing be reopened when a judicial officer revisits a detention order, and second, by ignoring the conditions that must be imposed when a defendant is released on personal recognizance. This Court should vacate the district court's second order and remand with directions to detain Burger pending a reopened detention hearing.

## I.  The evidence as a whole does not support the district court's order releasing Burger unconditionally.

The magistrate judge found after a hearing that Burger was too dangerous to release while the case against him is pending. Att. C; Att. R at 68:16-17. And Burger's counsel conceded that he at least "requires supervision" and "monitoring." Att. R at 64:18-20. The district court's order, which releases Burger without supervision or monitoring, has no support in this record.

The record from the detention hearing amply supports the magistrate judge's finding. The exhibits show the statements on Roblox that gave rise to Counts One and Two of the indictment and photos of Burger posing with guns. Att. D at 1-16. Those exhibits also include handwritten materials recovered when Burger moved from state to federal custody in May 2025. Att. D at 17-28; Att. R at 26:7-29:10. These handwritten materials include notes on bomb-making and a list of terrorist attacks bearing the notation "#JeSuisISIS" ("I am ISIS"). Att. D at 27; Att. R at 29:11-14. An agent testified that the materials listed in the bomb-making notes could potentially be used to produce a destructive device. Att. R at 27:13-20. Agent testimony also established that Burger's conduct troubled his family enough that they installed a keylogger on his computer and removed firearms from the house where he was then living. Att. R at 16:15-17:9.

The record developed since the detention hearing reinforces the magistrate judge's finding. As the government explained to the district court, the evidence shows that

- Burger's statements about a pending attack on Christians corresponded to the date of a Christian music concert promoted by a company whose website Burger visited before and after his statements, Att. J at 1-2; Att. M at 1-2;

- Burger searched the internet for "lone wolf terrorist isis," "Festivals happening near me," and suicide attacks, Att. G at 5; Att. M at 1-2;

- Burger pledged allegiance to the head of the Islamic State and stated he wanted to attack and kill Austin police officers, Att. G at 5; Att. M at 3;

- Burger stated that he was willing to sacrifice himself "in a blaze of iron and metal . . . raining bullets upon disbelievers and their soldiers/police," Att. M at 3;

- Burger was training with a rifle and saving for a suppressor, Att. J at 2; and

- Burger discussed that he wanted to put knives to people's throats and carry out a knife attack like a "friend" in Europe, Att. G at 5; Att. M at 3.

Ignoring this record, the district court instead accepted at face value unsworn assertions by Burger's counsel that he "poses no flight or safety risk." Att. V at 2; Att. X at 2.[5] And even then, the district court clearly erred by finding a "fact" unsupported even by those unsworn assertions. *See Franklin v. Regions Bank*, 125 F.4th 613, 631 (5th Cir. 2025) ("A finding is clearly erroneous if it is without substantial evidence to support it."). The district court found that Burger "has no *access to* firearms, weapons, or munitions." Att. X at 2

---

[5] The district court asserted that the government's motion for a hearing (Att. U) "raise[d] no facts that suggest otherwise." Att. X at 2. But it ignored the facts the government raised in its opposition to Burger's motion for release on personal recognizance, which it addressed in the same two-page order. Atts. V, W. That opposition referred to the evidence presented at the original detention hearing, offered to produce evidence of Burger's preparation for attacks in a reopened hearing, and highlighted Burger's threats and his family's alarm at his conduct. Att. W at 2-3.

(emphasis added). But Burger's counsel asserted only that Burger "*has* no fire-arms, weapons or munitions"—an unsurprising situation for someone just released from detention. Att. V at 2 (emphasis added). No assertions (much less evidence) establish that Burger will have no *access* to firearms, weapons, or munitions when he lives with his grandfather in an unspecified location not vetted by a pretrial-services officer. *See id.* The trial evidence would show, for example, that one of the rifles Burger posed with, Att. D at 13, belonged to a family member at the house where he had been staying.[6]

Considering the evidence as a whole—especially compared to the unsworn assertions the district court accepted—the district court order abused its discretion in releasing Burger unconditionally.

## II. The district court erred procedurally in releasing Burger on personal recognizance.

The district court also disregarded statutory requirements in arriving at its order releasing Burger unconditionally.

### A. The district court erred procedurally by failing to reopen the detention proceeding.

This Court's administrative-stay order allowed the district court to consider relief under 18 U.S.C. § 3143, which governs release or detention when, as in this case, the government has appealed under 18 U.S.C. § 3731. Section 3143(c) directs that a judicial officer "treat a defendant in a case in which

---

[6] Burger's attorneys have asserted that he will live with his grandfather in Florida, Att. V at 2—a residence different from the one from which his aunt and uncle had removed guns after becoming alarmed about his conduct, Att. W at 2.

an appeal has been taken by the United States under section 3731 of this title, in accordance with section 3142 of this title, unless the defendant is otherwise subject to a release or detention order." Disregarding § 3142 as a whole, the district court focused solely on § 3142(b), which allows release on personal recognizance. Att. X at 1.

That was procedural error. Under § 3142(f)(2)(A), "[t]he judicial officer"—the magistrate judge—had already held a detention hearing because there was a serious risk that Burger would flee. *See* Atts. B, R. The judicial officer determined after that hearing that Burger had to be detained because no condition or combination of conditions would reasonably assure his appearance and community safety. Att. C. Section 3142(f) specifies that the mechanism to revisit that determination is the judicial officer's reopening the hearing: "The hearing may be reopened . . . at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on" the defendant's risk of flight and to community safety. If a judicial officer could simply invoke § 3142(b) without reopening the hearing, the new-information requirement in § 3142(f) would be meaningless. The district court's invocation of § 3142(b) illustrates this point: It tossed aside the magistrate judge's determination without considering the evidence undergirding the previous detention order and without allowing the parties to present and test new evidence.

For several reasons, the district court's unconditional-release order has no support in a separate provision authorizing "[r]eview of a detention order," 18

U.S.C. § 3145(b). First, neither Burger nor the district court invoked that provision. Atts. V, X. Second, no part of the district court's unconditional-release order "review[ed]"—or even mentioned—the magistrate judge's order. *See Cabello*, 2025 WL 2738463, at *1 (explaining what review under § 3145(b) requires). Third, this Court's administrative stay did not authorize the district court to proceed under § 3145.

If the district court wanted to revisit the detention order, it should have directed the magistrate judge to reopen the detention hearing and to hear additional, material evidence from the parties. *See* § 3142(f). Circumventing that process was procedural error. And that procedural error was by definition an abuse of discretion. *See Cabello*, 2025 WL 2738463, at *1.

## B.   The district court erred procedurally by failing even to follow the release provision it invoked.

Even if the district court could have invoked § 3142(b), it erred procedurally—and thus abused its discretion—in implementing that provision. Even when a judicial officer can release a defendant on personal recognizance, that release must be "subject to the condition that the person not commit a Federal, State, or local crime during the period of release" and that "the person cooperate in the collection of a DNA sample." § 3143(b). The district court did not even impose those minimal conditions when it released Burger. Att. W. That error by itself justifies vacating the district court's order.

17

**Conclusion**

This Court should vacate the district court's second release order. If the district court's dismissal of the indictment and first release order remains stayed, the magistrate judge's detention order will remain in place. Thus, this Court should order Burger detained pending any reopening of the detention hearing under § 3142(f).

Respectfully submitted,

Justin R. Simmons
United States Attorney

By: */s/ Zachary C. Richter*
Zachary C. Richter
Assistant United States Attorney
903 San Jacinto, Suite 334
Austin, Texas 78701
(512) 916-5858
Zachary.C.Richter@usdoj.gov

**Attachments**

A.   ECF 1 Complaint
B.   ECF 3 Government Motion for Detention
C.   ECF 13 Detention Order
D.   ECF 14 Government Exhibit List and Exhibits from Detention Hearing
E.   ECF 40 Superseding Indictment
F.   ECF 53 Defendant's Motion to Dismiss Indictment
G.   ECF 59 Government's Response to Motion to Dismiss Indictment
H.   ECF 63 Defendant's Reply to Government's Response Motion to Dismiss
I.   ECF 68 Defendant's Post-Hearing Supplement to Motion to Dismiss
J.   ECF 70 Government's Post-Hearing Supplement in Opposition to Motion to Dismiss
K.   ECF 72 Government's Motion to Stay
L.   ECF 74 Defendant's Response to Motion to Stay
M.   ECF 75 Government's Brief in Support of Motion to Stay
N.   ECF 76 Order Denying Motion to Stay
O.   ECF 77 Order Granting Motion to Dismiss
P.   ECF 78 Government's Notice of Appeal
Q.   Government Trial Exhibit 3 (submitted to the district court November 24, 2025)
R.   Transcript of Detention Hearing of May 27, 2025
S.   Transcript of Motions Hearing of November 18, 2025
T.   Transcript of Status Conference of November 24, 2025
U.   ECF 79 Government's Motion for Detention/Bond Hearing
V.   ECF 81 Defendant's Motion for Release
W.   ECF 82 Government's Opposition to Motion for Release
X.   ECF 83 Release Order
Y.   ECF 91 Order Dismissing Indictment

**Certificate of Conference & Compliance with Fifth Circuit Rule 27.3**

I certify that the facts supporting emergency consideration of this motion are true and complete, and that before filing the motion, the U.S. Attorney's Office called the Clerk of Court's office and conferred with counsel for Burger. Burger opposes this motion.

/s/ Zachary C. Richter
Zachary C. Richter
Assistant United States Attorney

Dated: December 12, 2025

\*     \*     \*

**Certificate of Service**

I certify that on December 12, 2025, I filed this motion through this Court's electronic case-filing system, which will serve it on all registered counsel.

/s/ Zachary C. Richter
Zachary C. Richter
Assistant United States Attorney

**Certificate of Compliance with <u>Federal Rule of Appellate Procedure 27</u>**

I certify that

(1) this document complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because, excluding the parts of the document exempted by <u>Federal Rule of Appellate Procedure 32(f)</u>, this document contains 4,345 words; and

(2) this document complies with the typeface requirements of <u>Federal Rule of Appellate Procedure 32(a)(5)</u> and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it was prepared in a proportionally spaced typeface using Microsoft Office Word 2016 in Calisto MT font, size 14.

*/s/ Zachary C. Richter*
Zachary C. Richter
Assistant United States Attorney

Dated: December 12, 2025