# No. 25-50976
### consolidated with
# No. 25-51021

# In the United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA,
*Plaintiff-Appellant,*

v.

JAMES WESLEY BURGER,
*Defendant-Appellee.*

---

Appeal from the United States District Court
for the Western District of Texas, No. 1:25-cr-332

---

## BRIEF OF APPELLEE
## JAMES WESLEY BURGER

---

MAUREEN SCOTT FRANCO
Federal Public Defender
Western District of Texas
300 Convent Street, Suite 2300
San Antonio, Texas 78205
(210) 472-6700

CARL R. HENNIES
Assistant Federal Public Defender

*Attorney for Defendant-Appellee*

## CERTIFICATE OF INTERESTED PERSONS

### UNITED STATES v. JAMES WESLEY BURGER,
### Nos. 25-50976 & 25-51021

The undersigned counsel of record certifies that the persons having an interest in the outcome of this case are those listed below:

1. **James Wesley Burger,** Defendant-Appellee;

2. **Justin R. Simmons,** U.S. Attorney;

3. **Margaret Leachman,** former Acting U.S. Attorney;

4. **G. Karthik Srinivasan, Mark T. Roomberg,** and **Keith M. Henneke,** Assistant U.S. Attorneys, who represented Plaintiff-Appellant in the district court;

5. **Zachary Richter,** Assistant U.S. Attorney, who represents Plaintiff-Appellant in this Court;

6. **Maureen Scott Franco,** Federal Public Defender;

7. **Jose I. Gonzalez-Falla** and **Charlotte Anne Herring,** Assistant Federal Public Defenders, and **Jesus M. Salinas, Jr.,** former Assistant Federal Public Defender, who represented Defendant-Appellee in the district court; and

8. **Carl R. Hennies,** Assistant Federal Public Defender, who represents Defendant-Appellee in this Court.

i

This certificate is made so that the judges of this Court may evaluate possible disqualification or recusal.

s/ Carl R. Hennies

CARL R. HENNIES
*Attorney for Defendant-Appellee*

## ORAL ARGUMENT STATEMENT

Oral argument is scheduled for January 20, 2026.

# TABLE OF CONTENTS

Oral argument statement ................................................................. iii

Table of authorities ........................................................................ vii

Introduction.................................................................................... 1

Jurisdiction.................................................................................... 3

Statement of the issues ................................................................ 4

Statement of the case ................................................................... 4

    A.  Burger's difficult upbringing, unstable home
         environment, and increasing alienation. ...............................4

    B.  Burger makes provocative statements in Roblox's
         toxic "Church" experience. ......................................................5

    C.  Burger is arrested, detained, and indicted for his
         speech on Roblox. ...................................................................8

    D.  The government agrees not to introduce the
         statements Burger made in his interview.......................... 10

    E.  The district court dismisses the charges, holding
         that Burger's statements are protected by the First
         Amendment. ...........................................................................11

    F.  The district court releases Burger pending appeal,
         and he has continued counseling and reconnected
         with his family....................................................................... 13

Summary of the argument............................................................ 16

Argument....................................................................................... 17

I.  The district court correctly dismissed the indictment
    because Burger's statements on Roblox are protected
    by the First Amendment. ........................................................ 17

    A.  Standard of review. .............................................................. 18

B. The First Amendment's protections apply because Burger was charged for his speech. .................................... 18

C. Burger's vague, hyperbolic statements in Roblox's virtual universe were not serious expressions of an intent to commit real-world violence. .................................. 21

   1. The district court properly determined whether Burger's statements were true threats as a matter of law .................................................................. 21

   2. The district court correctly held that, taken in context, Burger's statements were not true threats as a matter of law ........................................... 28

      a. The statements were made in Roblox's Church experience, a roleplaying game known for trolling and distasteful debate. .......... 28

      b. The vague statements are hyperbolic, conditional, and lack the specificity required to be true threats. ................................... 32

      c. The government misplaces reliance on irrelevant evidence ................................................ 35

II. The government's appeal of the district court's order releasing Burger on personal recognizance is moot. ................ 38

III. There is no basis for this Court to exercise its extraordinary and rarely invoked power to reassign this case to a different district judge. ....................................... 40

A. Standard of review. ................................................................ 41

B. The district judge carefully considered an admittedly close question ....................................................... 42

C. None of the relevant factors warrant reassignment. ......... 44

   1. The district judge is not fixed in his views but rather assured the parties that he would follow this Court's decision. ....................................................... 44

2.  There is no basis to question the district
    judge's impartiality. .......................................... 49

3.  Reassigning this case to a new district judge
    would waste judicial resources ..................................... 51

Conclusion .......................................................................... 52

# TABLE OF AUTHORITIES

## Cases

*Am. Precision Ammunition, L.L.C. v. City of Mineral Wells*,
　90 F.4th 820 (5th Cir. 2024) ............................................................. 3

*Ashcroft v. American Civ. Liberties Union*,
　535 U.S. 564 (2002)................................................................18, 19

*Bailey v. Iles*,
　87 F.4th 275 (5th Cir. 2023) ........................................................20, 28

*Books v. Elkhart County*,
　401 F.3d 857 (7th Cir. 2005) ........................................................ 36

*Boos v. Barry*,
　485 U.S. 312 (1988) ...................................................................... 19

*Chaplinsky v. State of New Hampshire*,
　315 U.S. 568 (1942) ...................................................................... 19

*Counterman v. Colorado*,
　600 U.S. 66 (2023)........................................1, 19, 20, 27, 29, 31, 35

*Griggs v. Provident Consumer Disc. Co.*,
　459 U.S. 56 (1982) ........................................................................ 39

*Liteky v. United States*,
　510 U.S. 540 (1994)....................................................................45, 48

*M.D. v. Abbott*,
　119 F.4th 373 (5th Cir. 2024) ........................................................ 43

*Michigan v. Chesternut*,
　486 U.S. 567 (1988) ...................................................................... 36

*Raborn v. Inpatient Mgmt. Partners, Inc.*,
　352 F. App'x 881 (5th Cir. 2009)..................................................... 45

*SEC v. Barton*,
　135 F.4th 206 (5th Cir. 2025) ......................................................46, 51

*Smith v. Barry*,
　502 U.S. 244 (1992)........................................................................ 3

*State v. Metzinger,*
  456 S.W.3d 84 (Mo. Ct. App. 2015) ................................... 20, 23, 30

*Test Masters Educ. Servs., Inc. v. Singh,*
  428 F.3d 559 (5th Cir. 2005) ........................................... 48

*Texas v. Johnson,*
  491 U.S. 397 (1989) ........................................................ 18

*United States v. Alkhabaz,*
  104 F.3d 1492 (6th Cir. 1997) ......................................... 25

*United States v. Andrews,*
  390 F.3d 840 (5th Cir. 2004) ........................................ 49, 50

*United States v. Baker,*
  890 F. Supp. 1375 (E.D. Mich. 1995) ............................... 23, 25

*United States v. Bowen,*
  799 F.3d 336 (5th Cir. 2015) ........................................... 50

*United States v. Cisneros,*
  328 F.3d 610 (10th Cir. 2003) ......................................... 46

*United States v. Cook,*
  472 F. Supp. 3d 326 (N.D. Miss. 2020) ...................... 24, 26, 32, 33

*United States v. Daughenbaugh*
  49 F.3d 171 (5th Cir. 1995) ............................................. 22

*United States v. Flores,*
  404 F.3d 320 (5th Cir. 2005) ........................................... 25

*United States v. Heredia-Holguin,*
  823 F.3d 337 (5th Cir. 2016) ........................................... 38

*United States v. Hoffman,*
  901 F.3d 523 (5th Cir. 2018) ............................................. 3

*United States v. Jubert,*
  139 F.4th 484 (5th Cir. 2025) ......................................... 35

*United States v. Khan,*
  997 F.3d 242 (5th Cir. 2021) ..................................... 41, 42, 50

*United States v. Landham,*
  251 F.3d 1072 (6th Cir. 2001) ......................................... 23

*United States v. Lincoln*,
  403 F.3d 703 (9th Cir. 2005).......................................... 23

*United States v. Malik*,
  16 F.3d 45 (2d Cir. 1994).............................................. 22

*United States v. Maull*,
  773 F.2d 1479 (8th Cir. 1985) ....................................... 47

*United States v. McReynolds*,
  69 F.4th 326 (6th Cir. 2023) ......................................... 51

*United States v. Miah*,
  120 F.4th 99 (3d Cir. 2024) ........................................... 27

*United States v. Mix*,
  791 F.3d 603 (5th Cir. 2015)......................................... 26

*United States v. Morales*,
  272 F.3d 284 (5th Cir. 2001).........................20, 28, 32, 33

*United States v. Myers*,
  104 F.3d 76 (5th Cir. 1997) .......................................... 34

*United States v. O'Dwyer*,
  443 F. App'x 18 (5th Cir. 2011)........... 12, 22, 23, 25, 26, 34

*United States v. O'Dwyer*,
  2010 WL 2606657 (E.D. La. June 24, 2010)................... 24

*United States v. Pedroza-Rocha*,
  933 F.3d 490 (5th Cir. 2019)......................................... 18

*United States v. Perez*,
  43 F.4th 437 (5th Cir. 2022) .............................. 30, 32, 33

*United States v. Stanford*,
  883 F.3d 500 (5th Cir. 2018)...................................41, 43

*United States v. Stevens*,
  559 U.S. 460 (2010) ..................................................... 19

*United States v. Stock*,
  728 F.3d 287 (3d Cir. 2013) ......................................22, 23

*United States v. Viefhaus*,
  168 F.3d 392 (10th Cir. 1999)....................................... 23

*United States v. White,*
   670 F.3d 498 (4th Cir. 2012) ........................................................ 31

*United States v. Winters,*
   174 F.3d 478 (5th Cir. 1999) ........................................................ 41

*Virginia v. Black,*
   538 U.S. 343 (2003) .................................................................... 19

*Watts v. United States,*
   394 U.S. 705 (1969) ................................................ 18, 20, 22, 34

*Willey v. Harris Cnty. Dist. Att'y,*
   27 F.4th 1125 (5th Cir. 2022) ..................................................... 49

**Constitutional Provisions**

U.S. Const. amend. I ....................................................................... 18

**Statutes**

18 U.S.C. § 875(c) ...................................................................... 9, 18

18 U.S.C. § 3143 ............................................................................. 13

18 U.S.C. § 3145(b) ........................................................................ 47

**Rules**

Fed. R. App. P. 3(c)(1)(B) ............................................................... 3

**Other Authorities**

16A Am. Jur. 2d *Constitutional Law* § 526 ................................... 36

Australian Federal Police, *Holiday Season Warning:*
   *Extremists Infiltrating Online and Gaming Platforms to*
   *Recruit Young Australians* (Dec. 3, 2023) ................................... 6

# INTRODUCTION

Justices across the ideological spectrum recognize that "[t]he risk of overcriminalizing upsetting or frightening speech has only been increased by the internet." *Counterman v. Colorado*, 600 U.S. 66, 87 (2023) (Sotomayor, J., joined by Gorsuch, J., concurring). After all, "[d]ifferent corners of the internet have considerably different norms around appropriate speech." *Id.*

This case is Exhibit A. The government brought serious criminal charges against James Wesley Burger—a high schooler living in an Austin suburb—based solely on statements he made on Roblox. Roblox is an immersive, online gaming platform that allows players to participate in thousands of games and experiences created by other users. Players play these games and interact with each other in the form of virtual, Lego-like characters called avatars. Roblox encourages players to "be anything you can imagine," and some users take that slogan to the extreme. While most of the games on Roblox are innocuous, others are decidedly not. For example, players can roleplay as a school shooter in highly detailed simulations of the Columbine, Uvalde, and Parkland massacres. Players can also hire strippers for lap dances or virtual sex. And there are even replicas of Nazi concentration camps.

Burger's statements were made in a particularly toxic corner of the Roblox universe—an experience called "Church." Church was no more than a few rows of pews and a pulpit. And the entire point of Church was for players to engage in provocative debate, argue about controversial issues, and espouse extreme views. Some players dressed their avatars as Nazi SS officers denying the Holocaust. Other avatars portrayed skinheads and argued about race. Still others, including Burger, dressed in Middle Eastern-style clothing and roleplayed as Islamic extremists. Burger's avatar made statements in Church about "dealing a grievous wound upon followers of the Cross," discussed martyrdom, and claimed that he had prepared munitions in case the authorities tried to arrest him.

The issue on appeal is not whether Burger's speech on Roblox was disturbing or whether he exercised poor judgment. The issue is whether statements Burger made while roleplaying *in this virtual fantasy universe* were serious expressions that he intended to commit an act of violence *in the real world*. The district court correctly held that they were not. Rather, Burger's speech—no matter how offensive—was protected by the First Amendment. This Court should affirm the district court's dismissal of this unprecedented prosecution.

# JURISDICTION

This Court has jurisdiction over the district court's orders dismissing the indictment. *See* Gov't Br. 1. But the Court lacks jurisdiction over the district court's release orders:

- **First release order.** The government claims that it is appealing the district court's November 24 release order. *Id.* But that order is not listed in any of the government's notices of appeal, so this Court does not have jurisdiction to review it. A notice of appeal "must … designate the judgment—or the appealable order—from which the appeal is taken," Fed. R. App. P. 3(c)(1)(B), and "Rule 3's dictates are jurisdictional in nature, and their satisfaction is a prerequisite to appellate review." *Smith v. Barry*, 502 U.S. 244, 248 (1992).[1]

- **Second release order.** The government appealed the district court's December 4 release order, *see* ROA.532, but that appeal is now moot, *see infra* 38–40. And this Court "lack[s] subject matter jurisdiction to review a moot claim." *Am. Precision Ammunition, L.L.C. v. City of Mineral Wells*, 90 F.4th 820, 827 (5th Cir. 2024).

- **Third release order.** Although the government does not claim that it is appealing the district court's December 29 release order, Gov't Br. 1, it still argues that this order is a "nullity," *id.* at 39, and asks this Court to "vacate" it, *see* Gov't Ltr. Br. 1, ECF No. 95. Because the government has not appealed, this Court lacks jurisdiction. *See infra* 38–39.

---

[1] Any argument related to this order is also waived for inadequate briefing. *See United States v. Hoffman*, 901 F.3d 523, 553 (5th Cir. 2018).

## STATEMENT OF THE ISSUES

**1.**  Whether the district court correctly dismissed the indictment because Burger's statements on Roblox are protected speech under the First Amendment.

**2.**  Whether the government's appeal of the district court's order releasing Burger on personal recognizance is moot.

**3.**  If the Court remands, whether the Court should exercise its extraordinary and rarely invoked power to reassign this case to a different district judge.

## STATEMENT OF THE CASE

### A.  Burger's difficult upbringing, unstable home environment, and increasing alienation.

As a magistrate judge recognized early in the case, Burger is "a kid from hard knocks." ROA.608. His father is homeless, and his mother was abusive. Pretrial Services Report 2. So he has had an unstable home environment, bouncing between the homes of various relatives. *Id.* He lived with an aunt and uncle outside Dallas for a while, and then he moved in with a different aunt and uncle in Round Rock, Texas, an Austin suburb. *Id.* He has received mental health treatment to address childhood trauma, depression, and anxiety. *Id.* at 3. During Burger's senior year of high school, his uncle

noticed that he was becoming more alienated. ROA.557. Around this time, Burger was "seeking … an identity" and "seeking community," and he found it on Roblox, an online gaming platform. ROA.606.

### B. Burger makes provocative statements in Roblox's toxic "Church" experience.

Roblox markets itself as "the ultimate virtual universe that lets you create, share experiences with friends, and be anything you can imagine." ROA.108 (quoting Roblox website). It is a gaming platform that allows millions of individuals—including many children and teens—to play games and interact with each other. ROA.352, 549. In Roblox, players can create their own "experiences" or "games," which are immersive 3D environments. ROA.351–52. These user-created "fantasy worlds" can then be shared and played by other players. ROA.351–52, 574. Roblox users interact and play these games in the form of Lego-like avatars. ROA.352. Users can dress these avatars however they like, and avatars communicate with each other using chat bubbles that appear above an avatar's head for a few seconds and then disappear. ROA.353, 636.

Most experiences on Roblox are harmless, such as visiting a recreation of a famous museum, adopting a pet, or playing minigolf. Others stretch the boundaries of taste and imagination. One

experience allows users to participate in riots with ICE agents, either as protestors or law enforcement. ROA.352. Some experiences allow players to roleplay as strippers, where the user's virtual avatar will give lap dances to other avatars in clubs or have virtual sex. ROA.352. One game allows users to roleplay as a school shooter in highly detailed simulations of the Columbine, Uvalde, and Parkland massacres. ROA.352–53. There are even experiences that recreate Nazi concentration camps. *See* Australian Federal Police, *Holiday Season Warning: Extremists Infiltrating Online and Gaming Platforms to Recruit Young Australians* (Dec. 3, 2023).

Another distasteful Roblox experience was called "Church." ROA.353. Church was a virtual, 3D church with a few rows of pews, a pulpit, and a large cross on the wall. ROA.353. In this simple setting, about 100 avatars would argue about controversial issues, espouse extreme views, and engage in hate speech. ROA.353–54. Church hosted Roblox avatars dressed as skinheads arguing about race, members of the Irish Republic Army wearing balaclavas, Nazi SS officers denying the Holocaust, and avatars dressed in Middle Eastern clothing debating the Koran and discussing violent jihadism. ROA.635–36. One gaming blogger explained that Church

drew "one of the strangest player bases in all of gaming as its community turned it into a weird toxic debate game." ROA.353.

Burger participated in this Church experience with avatars named "Crazz3pain" and "Ghurabahh":

  

ROA.41, 43, 359. Burger used these avatars to roleplay as an Islamic extremist. ROA.637.

For example, Burger—while playing as Crazz3pain and interacting with other avatars in Church—stated that he would "deal a grievous wound upon the followers of the Cross." ROA.39. A few days later, Crazz3pain made a similar statement:

> I've come to conclude it will befall the 12 of
> Shawwal aa
> And it will be a music festival
> Attracting bounties of Christians
> In'shaa'allah we will attain martyrdom
> And deal a grievous wound upon the
> followers of the Cross

> Pray for me and enjoin yourself to martyrdom

ROA.16. And before either of these statements, Burger's avatar

Ghurabaah had said:

> Yes I have guns
> Incase the authorities
> Want to arrest me
> I am ready
> To sacrifice my life for my Rabb
> Detonate what I've prepared
> Of munitions
> And use my firearms
> To take many with me
> Yes wish me luck
> On the path of martyrdom
> In'shaa'allah

ROA.359–63. All three statements were made in January 2025.

ROA.96–98.

### C. Burger is arrested, detained, and indicted for his speech on Roblox.

One morning in late February 2025, Burger's uncle was about to

drive him to high school when about two dozen FBI agents wearing

tactical gear and carrying assault-style rifles descended on their

home. ROA.107–11. Burger was immediately handcuffed and placed

in the back of a law enforcement vehicle. ROA.111. After a while, he

was brought into the home and interrogated by FBI agents for nearly

12 hours while other agents were searching the home. ROA.113. At no point during this interview did agents read Burger his *Miranda* rights. ROA.129. Soon after questioning ceased, Burger was arrested. ROA.125.

A federal criminal complaint was filed, ROA.11, and the government moved to detain Burger because it believed that there was a "serious risk that [he] will flee," ROA.23. At the time of the detention hearing, Burger did not have a place to live. ROA.601. And Burger's attorney acknowledged that he required "supervision," "monitoring," and "psychological counseling." ROA.605–06. A magistrate judge ordered that Burger be detained. ROA.33–34, 609.

In a superseding indictment, the government charged Burger with three counts of making an interstate threat to injure the person of another in violation of 18 U.S.C. § 875(c). ROA.96–98. The three counts were based on statements that Burger made "on Roblox" and corresponded to the statements detailed above. ROA.96–98. Count one alleged that the statement about "deal[ing] a grievous wound upon the followers of the Cross" was a threat. ROA.96. Count two alleged that the statement about a "music festival/Attracting bounties of Christians" was a threat. ROA. 97. And count three

alleged that the statement about "hav[ing] guns In[ ]case the authorities want to arrest me" was a threat. ROA.97–98.

Burger pleaded not guilty. ROA.617.

### D. The government agrees not to introduce the statements Burger made in his interview.

Burger moved to suppress statements made during the 11-and-a-half-hour interview that FBI agents conducted as they were executing a search warrant at his home. ROA.107–43. Burger argued he was in custody because of the police-dominated atmosphere in his home, the restrictions on his movements, the length of the interview, and the accusatory nature of the questioning. ROA.129–42. Since he was in custody but never read his *Miranda* rights, he argued that his statements must be suppressed. ROA.142.

In response, the government "agree[d] to not offer [Burger's] statements … in the government's case-in-chief at trial." ROA.405. But the government "reserve[d] the right to use those statements in response to evidence, testimony, or argument by the defense that opens the door to the use of such statements." ROA.405. Fleshing out the government's position led to discussion, confusion, and some concern on the part of the district court. *See* ROA.621–23, 683–86;

Mot. Hr'g Tr. 24–30, *United States v. Burger*, No. 1:25-cr-332, ECF No. 110 (W.D. Tex. Dec. 29, 2025) ("Dec. 29 Hr'g").

### E. The district court dismisses the charges, holding that Burger's statements are protected by the First Amendment.

Burger also moved to dismiss the superseding indictment. ROA.351–73. Burger argued that his statements were not "true threats" and so were protected speech under the First Amendment. ROA.364–69. He explained that both the statements' lack of specificity and their context—they were made while he was playing a virtual character in the Church experience on Roblox—established that they were not true threats as a matter of law. ROA.367–69. In response, the government asserted that Burger's statements were true threats falling outside the First Amendment's protections. ROA.388–402.

The district court held two lengthy hearings on the motion to dismiss. *See* ROA.619–81, 682–719. The court admitted that this was the "most difficult case" it had handled and that it had "struggled" with how to decide it. ROA.712, 715. At the end of the second hearing, the district court dismissed the indictment on First Amendment grounds and said that it would issue a written order.

ROA.715. The court confirmed that with no indictment in place Burger would be released, and the government agreed. ROA.715.

In its written order, the district court—relying on this Court's precedent—explained that it must "perform[] a gatekeeping function in deciding, as a matter of law, whether the First Amendment protects the defendant's speech." ROA.525 (citing *United States v. O'Dwyer*, 443 F. App'x 18, 20 (5th Cir. 2011)). In conducting this analysis, the court "accept[ed] the Government's versions of the facts as true" but declined to consider evidence that "was not known to any recipient of the allegedly threatening communications." ROA.526. The court focused on the "context" of the statements, explaining that they were made in "Roblox's Church, where individuals appear as avatars and intentionally engage in distasteful debate." ROA.527. In other words, Burger "made the statements at issue while playing an *online video game*, speaking as a *character*, among other *players* who were similarly acting as *characters* in a virtual Church." ROA.527 (emphasis in original). The court also noted all three statements' "lack of specificity." ROA.528–30. Because "no reasonable jury could conclude that the charged statements were true threats," the court held that "Burger's

statements, as abhorrent as they are, are protected by the First Amendment." ROA.530.

### F. The district court releases Burger pending appeal, and he has continued counseling and reconnected with his family.

After the district court dismissed the indictment, the government filed an emergency motion in this Court to stay the district court's dismissal and release orders. Gov't Emergency Mot. to Stay, ECF No. 12-1. A motions panel administratively stayed the orders but explained that "this temporary administrative stay does not affect any relief that the district court may provide pursuant to 18 U.S.C. § 3143," the provision governing release or detention pending appeal. Unpub. Order, ECF No. 28-1. Burger then moved for release pending appeal, ROA.505–07, and the district court released Burger on personal recognizance, ROA.514–15.

The government again moved for emergency relief, asking this Court to vacate the order releasing Burger on personal recognizance. Gov't Emergency Mot. to Vacate, ECF No. 51-1. A motions panel administratively stayed that order too. Unpub. Order, ECF No. 79-1. Although the motions panel did not reach the merits of the government's motion, it expressed concern that Pretrial Services was

not involved in the decision to release Burger unconditionally, that the order was based only on representations by Burger's counsel, and that Burger's counsel at the initial detention hearing had suggested that strict conditions of release may be required. *Id.* at 3. The Court later clarified that this administrative stay did not foreclose further proceedings in the district court under § 3143, explaining that the government could ask the district court to detain Burger or release him on conditions. Unpub. Order 2, ECF No. 81-1.

Burger then filed a motion asking the district court to revoke the detention order issued by the magistrate judge at the beginning of the case. Burger Mot. to Revoke Detention Order, *United States v. Burger*, No. 1:25-cr-332, ECF No. 98 (W.D. Tex. Dec. 23, 2025). The same day, the government filed an emergency motion for an arrest warrant. Gov't Emergency Mot. for Arrest Warrant, *United States v. Burger*, No. 1:25-cr-332, ECF No. 99 (W.D. Tex. Dec. 23, 2025).

The district court held a hearing on these dueling motions. *See generally* Dec. 29 Hr'g. The government introduced evidence through an FBI agent, *id.* at 14–36, and Burger's grandfather testified about his living situation and his willingness for Burger to live with him, *id.* at 46–52. Although the government argued that Burger should be detained, it asserted that, at a minimum, he should be subject to

14

strict conditions such as home detention with electronic monitoring. *Id.* at 43. The district court consulted Pretrial Services to establish conditions of release, deferring to Pretrial Services on many conditions. *Id.* at 54–63. The district court then released Burger to the custody of his grandfather and imposed strict conditions, including home detention, GPS location monitoring, not possessing firearms, and continuing to attend counseling. Order Setting Conditions of Release, *United States v. Burger*, No. 1:25-cr-332, ECF No. 104 (W.D. Tex. Dec. 29, 2025).

Burger has now been released from detention for more than six weeks. During this time he has continued to attend counseling with Parents for Peace, a "nonprofit organization specializing in early intervention, disengagement, and prevention of violent extremism." Parents for Peace Ltr. 1, *United States v. Burger*, No. 1:25-cr-332, ECF No. 98-2 (W.D. Tex. Dec. 23, 2025). The social worker who has been assisting Burger believes that he "does not present as an individual seeking harm, but rather as a young person who has undergone a significant corrective experience and demonstrated growth, emotional regulation, and improved judgment." *Id.* at 2. Burger has also reconnected with his family, including celebrating Christmas and Hanukkah; engaged in hobbies like building puzzles

and walking his dog; and attended religious services with his grandfather. Burger Ltr. 1, *United States v. Burger*, No. 1:25-cr-332, ECF No. 106 (W.D. Tex. Dec. 29, 2025).

## SUMMARY OF THE ARGUMENT

**1.** This Court should affirm the district court's dismissal of the charges against Burger because his speech is protected by the First Amendment. The district court properly considered, as a threshold matter, whether the statements alleged in the indictment were true threats as a matter of law. And given the vague, hyperbolic nature of those statements and the context in which they were made— roleplaying in a virtual universe intended for toxic debate—the district court correctly held that no reasonable jury could conclude that those statements were serious expressions of an intent to commit violence in the real world.

**2.** Although the government appealed the district court's order releasing Burger on personal recognizance pending appeal (what it terms the "second release order"), that appeal is moot. The district court has now imposed strict conditions of release, and Burger does not challenge those conditions. Any decision by this Court on the

second release order would be an advisory opinion. So this Court should dismiss the government's appeal of that order as moot.

**3.** If the Court reverses the district court's dismissal and remands for trial, it should decline to exercise its extraordinary power to reassign the case to a different district judge. This case is a far cry from the rare case in which that remedy is warranted. An experienced district judge carefully considered an admittedly difficult issue. The mere fact that he ruled against the government is no basis to conclude that he is fixed in his views, and the record contains no hint of bias or antagonism suggesting that the district judge would not conduct a fair trial.

## ARGUMENT

## I.    The district court correctly dismissed the indictment because Burger's statements on Roblox are protected by the First Amendment.

The government charged Burger with serious offenses based solely on his speech on Roblox. As the district court correctly determined, those rambling, hyperbolic statements—made in a virtual, roleplaying environment intended for provocative debate— were not serious expressions that he intended to commit an act of violence in the real world. This Court should affirm the district

court's dismissal of the indictment because Burger's statements—no matter how disturbing—are protected by the First Amendment.

## A. Standard of review.

"This [C]ourt reviews the district court's ruling on a motion to dismiss an indictment de novo." *United States v. Pedroza-Rocha*, 933 F.3d 490, 496 (5th Cir. 2019).

## B. The First Amendment's protections apply because Burger was charged for his speech.

Because the statute the government charged Burger with violating—18 U.S.C. § 875(c)—criminalizes "pure speech," it "must be interpreted with the commands of the First Amendment clearly in mind." *Watts v. United States*, 394 U.S. 705, 707 (1969). The First Amendment provides that "Congress shall make no law … abridging the freedom of speech." U.S. Const. amend. I. "[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. American Civ. Liberties Union*, 535 U.S. 564, 573 (2002) (cleaned up). That is true even if speech is "offensive or disagreeable," *Texas v. Johnson*, 491 U.S. 397, 414 (1989), or expresses "ideas that the overwhelming majority of people might find distasteful or discomforting," *Virginia v. Black*, 538 U.S.

343, 358 (2003). After all, "citizens must tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment." *Boos v. Barry*, 485 U.S. 312, 322 (1988). And "First Amendment vigilance is especially important when speech is disturbing, frightening, or painful, because the undesirability of such speech will place a heavy thumb in favor of silencing it." *Counterman v. Colorado*, 600 U.S. 66, 87 (2023) (Sotomayor, J., joined by Gorsuch, J., concurring).

The First Amendment's protections, however, are "not absolute." *Ashcroft*, 535 U.S. at 573. Since the founding, "the First Amendment has permitted restrictions upon the content of speech in a few limited areas." *United States v. Stevens*, 559 U.S. 460, 468 (2010). These categories are "well-defined and narrowly limited." *Chaplinsky v. State of New Hampshire*, 315 U.S. 568, 571 (1942). Relevant here, "[t]rue threats of violence … lie outside the bounds of the First Amendment." *Counterman*, 600 U.S. at 74. "True threats are 'serious expressions' conveying that a speaker means to 'commit an act of unlawful violence.'" *Id.* (quoting *Black*, 538 U.S. at 359). The existence of a true threat "depends … on what the statement conveys to the person on the other end." *Id.* (cleaned up). In other words, a statement is a true threat "if in its context it would have a reasonable

tendency to create apprehension that its originator will act according to its tenor." *United States v. Morales*, 272 F.3d 284, 287 (5th Cir. 2001) (cleaned up). "The 'true' in that term distinguishes what is at issue from jests, hyperbole, or other statements that when taken in context do not convey a real possibility that violence will follow." *Counterman*, 600 U.S. at 74 (cleaned up).

When analyzing whether a statement is a true threat, "context is critical." *Bailey v. Iles*, 87 F.4th 275, 285 (5th Cir. 2023). Context often shows that a statement that may otherwise be threatening "lack[s] believability and [is] not serious." *Id.* For example, the Supreme Court in *Watts* held that the defendant's statement—"If they ever make me carry a rifle the first man I want to get in my sights is L.B.J."—could not be interpreted as a true threat when "taken in context," including the fact that it was made at a political rally and the crowd reacted with laughter. 394 U.S. at 706–08. Similarly, a state appellate court held that tweets referencing "pressure cookers and allusions to the Boston Marathon bombing"— although "tasteless and offensive"—were not true threats because "they were made in the context of sports rivalry, an area often subject to impassioned language and hyperbole." *State v. Metzinger*, 456 S.W.3d 84, 97 (Mo. Ct. App. 2015).

### C. Burger's vague, hyperbolic statements in Roblox's virtual universe were not serious expressions of an intent to commit real-world violence.

Because the charges that the government brought against Burger implicate the First Amendment, the indictment can only stand if his statements were true threats. The government argues that the district court erred both procedurally (by reaching this issue on a motion to dismiss) and substantively (by holding that the statements were not true threats as a matter of law). Both arguments fail. *First*, this Court has explained that dismissing an indictment pretrial is the proper procedure when it fails to allege a true threat as a matter of law. *Second*, the district court correctly held that Burger's disjointed statements taken in context—they were made in Roblox's toxic "Church" experience where players roleplayed, engaged in distasteful debate, and espoused extreme views—were not serious expressions of an intent to commit violence.

### 1. The district court properly determined whether Burger's statements were true threats as a matter of law.

The government criticizes the district court for acting as a "gatekeeper" and deciding whether Burger's statements were true threats, arguing that "these questions are for a jury to decide at

trial." Gov't Br. 18. To be sure, whether a statement constitutes a true threat is *generally* an issue of fact for the jury. *See United States v. Daughenbaugh*, 49 F.3d 171, 173 (5th Cir. 1995); *see also*, *e.g.*, *United States v. Stock*, 728 F.3d 287, 298 (3d Cir. 2013) ("*In the usual case*, whether a communication constitutes a threat or a true threat is a matter to be decided by the trier of fact." (emphasis added)); *United States v. Malik*, 16 F.3d 45, 51 (2d Cir. 1994) ("Absent … an unusual set of facts, … existence *vel non* of a 'true threat' is a question generally best left to a jury.").

But not always. "[A] court may conclude that a communication does not constitute a threat as a matter of law in certain cases." *Stock*, 728 F.3d at 298. And "[i]t is not unprecedented for a court to conclude that a communication does not legally qualify as a … true threat." *Id*. After all, that is exactly what the Supreme Court did in *Watts*. There, the Court reversed the defendant's conviction because, as a matter of law, the defendant's statement was mere "political hyperbole" that could not reasonably be interpreted as a true threat. *Watts*, 394 U.S. at 708. This Court has also held that a defendant's "statement is not a true threat as a matter of law." *United States v. O'Dwyer*, 443 F. App'x 18, 20 (5th Cir. 2011). Other federal and state appellate courts have done the same. *See*, *e.g.*, *United States v.*

*Lincoln*, 403 F.3d 703, 706–08 (9th Cir. 2005) (holding that letter written by defendant "did not constitute a true threat" as a matter of law); *United States v. Landham*, 251 F.3d 1072, 1082 (6th Cir. 2001) (holding that "the indictment failed, as a matter of law, to allege a violation of § 875(c)" because alleged statement was not a true threat); *Metzinger*, 456 S.W.3d at 97 (holding that, "as a matter of law, … four tweets did not constitute 'true threats'").

And "a court may properly dismiss an indictment as a matter of law if it concludes that no reasonable jury could find that the alleged communication constitutes a … true threat." *Stock*, 728 F.3d at 298; *see United States v. Viefhaus*, 168 F.3d 392, 397 (10th Cir. 1999) ("If there is no question that a defendant's speech is protected by the First Amendment, the court may dismiss the charge as a matter of law."); *United States v. Baker*, 890 F. Supp. 1375, 1385 (E.D. Mich. 1995) ("Whether or not a prosecution under § 875(c) encroaches on constitutionally protected speech is a question appropriately decided by the Court as a threshold matter."). That is the precise outcome this Court endorsed in *O'Dwyer*, when the Court affirmed the dismissal of an indictment because "no reasonable jury could find that [the defendant's] communication constitutes a true threat." 443 F. App'x at 20. And contrary to its argument on appeal, below the

government acknowledged that "[i]f as a matter of law this was not a true threat, then the Court would be within its right to dismiss the case." ROA.695.

District courts routinely play this important gatekeeping role by dismissing charges when the alleged speech is not a true threat as a matter of law. For example, a district court in this circuit recently dismissed a cyberstalking charge because, "when read in context," the defendant's "Facebook posts [were] not 'true threats.'" *United States v. Cook*, 472 F. Supp. 3d 326, 335 (N.D. Miss. 2020).[2] Another district court in this circuit dismissed a § 875(c) charge because the defendant's statements were "insufficient to warrant submission to a jury to determine if they are a true threat." *United States v. O'Dwyer*, 2010 WL 2606657, at *2 (E.D. La. June 24, 2010). The government appealed, advancing the same argument it does here. *See* Gov't Br. 11, *United States v. O'Dwyer*, No. 10-30701 (5th Cir. June 21, 2011) ("[T]he district erred under settled law from this Court by removing the question of fact of a 'true threat' from the jury."). As discussed above, this Court rejected the government's argument and affirmed.

---

[2] Although the government initially appealed the district court's dismissal, it later withdrew its appeal. *See United States v. Cook*, No. 20-60738 (5th Cir. Nov. 23, 2022).

*O'Dwyer*, 443 F. App'x at 20. And yet another district court dismissed § 875(c) charges because "the language set forth [in the indictment] is so facially insufficient that it cannot possibly amount to a true threat." *Baker*, 890 F. Supp. at 1385, *aff'd sub nom. United States v. Alkhabaz*, 104 F.3d 1492 (6th Cir. 1997).

None of this is inconsistent with Federal Rule of Criminal Procedure 12, as the government contends. *See* Gov't Br. 19–27. The district court complied with Rule 12 because it "based its disposition entirely on its resolution of a legal question and the facts are undisputed." *United States v. Flores*, 404 F.3d 320, 323 (5th Cir. 2005), *abrogated on other grounds by Abramski v. United States*, 573 U.S. 169 (2014). Given that this Court has endorsed pretrial dismissal when a statement is not a true threat as a matter of law in *O'Dwyer*, the government's arguments that the district court somehow misapplied Rule 12 fall flat.

*First*, the government argues that the "district court resolved disputed facts bearing on whether Burger's statements were true threats." Gov't Br. 20. Not so. The district court based its decision on Burger's statements and their context as alleged in the indictment. *See* ROA.527–530. Neither the statements themselves nor their context were disputed. The indictment alleges three statements

made "on Roblox." ROA.96–98. There is no dispute about what Roblox is. Everyone agrees that Roblox is an online "gaming" platform. *See, e.g.*, ROA.13 (affidavit in support of criminal complaint); ROA.390 (government response to motion to dismiss). And the government never disputed that the Church experience was a "weird toxic debate game." ROA.353. In fact, the government agreed that the "[C]hurch experience was meant for debate." ROA.690. Armed with these undisputed facts—the statements themselves and the context in which they were made—the district court properly decided a purely legal question: that those statements read in that context were not true threats as a matter of law. *See O'Dwyer*, 443 F. App'x at 20; *Cook*, 472 F. Supp. 3d at 335.

*Second*, the government argues that the district court relied on "an incomplete pretrial record." Gov't Br. 24. But the government has forfeited this argument by failing to raise it in the district court. *See United States v. Mix*, 791 F.3d 603, 612 (5th Cir. 2015) ("[T]he government did not urge this point below, so it is forfeited"). Although the motion to dismiss was extensively litigated below, the government never suggested that the factual record was incomplete. *See* ROA.388–402, 467–71. In any event, the government never

points to any additional evidence that is relevant to analyzing whether Burger's statements were true threats.

*Third*, the government tries to manufacture a factual dispute by relying on "[e]vidence of Burger's conduct *outside Roblox*." Gov't Br. 23–24 (emphasis added). But the district court correctly rejected this "out-of-context, extrinsic evidence unknown to any recipient of the alleged threatening communications" as "irrelevant." ROA.527. After all, the "existence of a threat depends not on the mental state of the author, but on what the statement conveys to the person on the other end." *Counterman*, 600 U.S. at 74 (cleaned up). So the relevant "context" of a statement includes aspects that a listener is actually aware of: "the speaker's tone, the audience, the medium for the communication, and the broader exchange in which the statement occurs." *Id.* at 114 (Barrett, J., dissenting). None of the government's evidence from outside Roblox, however, was known to the players who saw Burger's statements in Roblox. The government misplaces reliance on *United States v. Miah*, 120 F.4th 99 (3d Cir. 2024). *See* Gov't Br. 23. The issue here is not what evidence may or may not be admissible at trial. The issue is whether the statements and context alleged in the indictment are sufficient to establish true threats. As explained below, they are not. *See infra* 28–38.

### 2. The district court correctly held that, taken in context, Burger's statements were not true threats as a matter of law.

Courts look at both the "character and context" of a statement when considering whether it is a true threat. *Morales*, <u>272 F.3d at 288</u>. That is what the district court did here. The court explained that the statements were made in the context of Roblox's Church experience, a virtual roleplaying game known for distasteful debate. <u>ROA.527</u>–28. The court also explained that the statements themselves were vague, nonspecific, and conditional. <u>ROA.528</u>–30. The district court was correct on both counts, as well as its conclusion that the statements taken in context are not true threats as a matter of law. <u>ROA.530</u>. This Court should reject the government's reliance on unalleged "evidence" unconnected to the statements' content and context that is irrelevant to the true threat analysis.

### a. The statements were made in Roblox's Church experience, a roleplaying game known for trolling and distasteful debate.

When evaluating whether a statement is a true threat, "context is critical." *Bailey*, <u>87 F.4th at 285</u>. Each count in the superseding indictment alleges that Burger's statements were made "on Roblox." <u>ROA.96</u>–98. And that is the context that the district court

correctly focused its analysis on, explaining that Burger made his statements "while playing an *online video game*, speaking as a *character*, among other *players* who were similarly acting as *characters* in a virtual Church." ROA.527 (emphasis in original). As the district court recognized, in the Church experience "individuals appear as avatars" and "engage[] in role-play," including "trolling" and "intentionally engaging in distasteful debate." ROA.524, 527.

This undisputed context confirms that Burger's statements were not "serious expressions conveying that a speaker means to commit an act of unlawful violence." *See Counterman*, 600 U.S. at 74 (cleaned up). Rather, they were fictional statements made by Burger's Lego-like avatar who was portraying an Islamic extremist in a virtual environment designed for distasteful debate and provocative roleplay. Roblox is not the real world. Statements by Burger's character in this *fantasy universe* were not threats to take any concrete action in the *real world*. Indeed, Roblox allows users to roleplay insidious conduct that may not be tolerated in reality but is tolerated because it takes place in a fictional, virtual setting. Just as someone whose avatar recreates the Columbine massacre on Roblox cannot be prosecuted for murder, someone who makes distasteful statements on Roblox cannot be prosecuted for making

a true threat. In either case, the conduct—here, pure speech—is entirely virtual.

Not surprisingly, the government cannot cite a remotely similar case holding that statements made in a virtual roleplaying context are true threats. *See* Gov't Br. 32–33. The only case the government relies on to support its argument that Burger's statements could be true threats—even though they were made in an online gaming context—involved threats to spread COVID-19 at two specific, *real-world* grocery stores. *Id*. at 32–33 (citing *United States v. Perez*, 43 F.4th 437, 443 (5th Cir. 2022)). *Perez* is a far cry from the facts here. Indeed, this case involves "rather unique circumstances." *See Metzinger*, 456 S.W.3d at 98. In *Metzinger*, the court affirmed the dismissal of an indictment charging the defendant with making terroristic threats—which referenced the Boston Marathon bombing—during the World Series between the St. Louis Cardinals and the Boston Red Sox. *Id*. at 88. The court explained that the defendant's tweets were "made in the context of sports rivalry, an area often subject to impassioned language and hyperbole." *Id*. at 97. In that context, "a reasonable recipient would not interpret them as serious expressions of an intent to commit violence." *Id*. That reasoning applies with even more force here given the unique

30

context of Roblox and undisputed evidence that the Church experience was intended for hyperbolic and provocative debate.

And pretrial resolution was especially appropriate in this unique context to avoid chilling protected speech. Under the government's theory, the toxic debate taking place between avatars in Church exists—at best—"in a gray area where it will be quite hard to predict whether a jury would find it threatening." *See Counterman*, 600 U.S. at 88 (Sotomayor, J., joined by Gorsuch, J., concurring). Plus, "speakers whose ideas or views occupy the fringes of our society have more to fear, for their violent and extreme rhetoric, even if intended simply to convey an idea or express displeasure, is more likely to strike a reasonable person as threatening." *United States v. White*, 670 F.3d 498, 525 (4th Cir. 2012) (Floyd, J., concurring in part and dissenting in part). So prosecuting individuals for their online speech in virtual roleplaying games risks chilling a substantial amount of speech. And reversing the district court here risks opening the floodgates for prosecutions based on distasteful or even abhorrent speech in online gaming environments that is exceedingly unlikely to result in any real-world harm.

### b.   The vague statements are hyperbolic, conditional, and lack the specificity required to be true threats.

Even on their own terms, the district court correctly determined that the three statements alleged in the indictment fall well short of the threshold for being true threats. ROA.528–30. The statements are hyperbolic, borderline incoherent, and lack the specificity required to be true threats.

Count one alleges that Burger's statement in Roblox that he would "deal a grievous wound upon the followers of the Cross" was a true threat. ROA.96. Not so. This statement lacks any specificity about when, where, or how any purported attack may occur. This Court's precedent requires a true threat to either name a particular group or at least target a place those individuals are likely to be. *See Perez*, 43 F.4th at 444 (explaining that the true threat analysis does not turn on "whether a speaker names individuals or merely places them where those individuals are likely to be"); *Morales*, 272 F.3d at 286 (affirming § 875(c) conviction where defendant threatened to kill students at a specific high school); *Cook*, 472 F. Supp. 3d at 334 (explaining that the "common threads" in this Court's caselaw are that the "threat specifically identified a target" and the "threat was specific enough as to place, time or method"). Burger's statement did

neither. Although the statement seems to be referring to Christians in general, it did not threaten any particular or identifiable group. As alleged, this vague statement "lack[s] entirely the specificity required to bring [it] under the umbrella of a true threat," *see Cook*, 472 F. Supp. 3d at 335, and has no "tendency to create apprehension that its originator will act according to its tenor," *see Morales*, 272 F.3d at 287.

Count two alleges that a similar statement that Burger made a few days later on Roblox—"I've come to conclude it will befall the 12 of Shawal aa/And it will be a music festival/Attracting bounties of Christians/In'shaa'allah we will attain martyrdom/And deal a grievous wound upon the followers of the Cross/Pray for me and enjoin yourself to martyrdom"—is a true threat. ROA.97. Although this rambling statement may have slightly more detail, it also falls well short of being a true threat. Again, it never specifies the location where the supposedly threatened individuals "are likely to be." *See Perez*, 43. F.4th at 444. So while the defendant in *Perez* placed employees and potential shoppers at two specific grocery stores at risk, *id.* at 443, and the defendant in *Morales* placed students at a particular high school at risk, 272 F.3d at 286, it is

33

impossible to tell who may have been the potential victims of Burger's vague statement or where they may be located.

Finally, count three alleges that Burger made an earlier threat on Roblox when he said "I have guns In[ ]case the authorities want to arrest me … I am ready To sacrifice my life for my Rabb … [The Defendant would] Detonate what I've prepared Of munitions And use my firearms To take many with me, [and] Yes wish me luck On the path of martyrdom In'shaa'allah." ROA.98. This is not a true threat because "it was expressly made conditional upon an event": authorities attempting to arrest Burger. *See Watts*, 394 U.S. at 707. This Court has held that a similar "hypothetical and conditional" statement was not a true threat as a matter of law. *O'Dwyer*, 443 F. App'x at 20. In arguing otherwise, the government misplaces reliance on *United States v. Myers*, 104 F.3d 76 (5th Cir. 1997). *See* Gov't Br. 31–32. In *Myers*, the defendant challenged only whether there was sufficient evidence that he "made his threats voluntarily." 104 F.3d at 78–79. He never challenged whether the statements were true threats. So this Court had no reason to hold—and did not hold, as the government claims—that "a conditional threat can be a true threat." Gov't Br. 32. This statement is also vague. Because it predated the "grievous wound" statements, there is no context for

why law enforcement would possibly have an interest in Burger. Indeed, this statement is more hyperbole and posturing than a real-world threat. After all, Burger did *not* "have guns" and he had *not* "prepared … munitions" when he was arrested.

### c.   The government misplaces reliance on irrelevant evidence.

Unable to defend the content of the statements or the virtual context in which they were made, the government resorts to relying on unalleged and out-of-context evidence that is irrelevant to analyzing whether the statements were true threats.

*First*, the government relies heavily on "[e]vidence of Burger's conduct *outside Roblox*." Gov't Br. 23 (emphasis added). As discussed above, that evidence is irrelevant to the true threats inquiry: "what the statement conveys to the person on the other end." *Counterman*, 600 U.S. at 74; *see supra* 27.

*Second*, the government repeatedly notes that two Roblox players contacted the FBI after Burger made his statements. Gov't Br. 21, 29, 31, 33. But this too is irrelevant to the true threats analysis, which asks "whether a *reasonable person* would perceive the statement as threatening." *United States v. Jubert*, 139 F.4th 484, 491 (5th Cir. 2025) (emphasis added). When applying this type

of objective standard, a "particular individual's response" is irrelevant. *Michigan v. Chesternut*, 486 U.S. 567, 574 (1988); *Books v. Elkhart County*, 401 F.3d 857, 867 (7th Cir. 2005) (distinguishing an "objective, reasonable person" from "the hypersensitive or easily offended"). Although two sensitive individuals were alarmed and contacted the FBI after seeing Burger's statements, dozens of other Roblox players who were engaging in equally hyperbolic statements in Church apparently did *not* take his statements seriously as real-world threats.[3] It is the perspective of a reasonable person—not the sensitivities of the most easily offended individuals—that matters. In any event, the fact that two users were alarmed by Burger's speech does not make his statements true threats. Even protected speech may "alarm the addressee." 16A AM. JUR. 2d *Constitutional Law* § 526 (explaining that the term "true threats" "excludes the

---

[3] The government claims that the in-game reactions of other Roblox users in addition to the two who contacted the FBI confirm that they also regarded Baker's statements as real threats. Gov't Br. 29. But the reactions of these users—again, who did *not* contact authorities—are entirely consistent with the roleplaying nature of Church. ROA.36–43. If anything, that almost all of the players in Church continued with their roleplaying after Burger's statements is relevant context showing that his statements were *not* true threats. *See Watts*, 394 U.S. at 707 (explaining that the "crowd laugh[ing]" was relevant context).

kind of hyperbole, rhetorical excesses, and impotent expressions of anger or frustration that in some contexts can be privileged even if they alarm the addressee").

*Third*, the government repeats its cryptic suggestion that there was a Christian music festival scheduled for April 12 in Austin. Gov't Br. 30. But the government never alleged this fact as context in the indictment, and the government has never identified the specific music festival it claims was taking place that day. Most importantly, the government conceded that it cannot link this particular (mystery) festival to Burger in any way. ROA.673. The government merely guesses that Burger's statements in Roblox's virtual environment may have been referring to this music festival. Such unfounded speculation is insufficient to turn Burger's unspecific statements into true threats.

*     *     *

The indictment alleges three statements that Burger made on Roblox. Those statements, taken in context, show that Burger was roleplaying as an Islamic extremist in a virtual church-like environment designed for provocative debate. Nothing about the vague statements or their context suggests that Burger was

threatening real-world violence. This Court should affirm the district court's dismissal of the indictment because Burger's statements were not true threats as a matter of law.

## II.   The government's appeal of the district court's order releasing Burger on personal recognizance is moot.

The government appealed the district court's order releasing Burger on personal recognizance, *see* ROA.514–15, but that appeal is moot. Burger is no longer on personal recognizance. The district court has recently imposed strict conditions of release, including home detention, GPS monitoring, no access to firearms, and continuing to attend counseling. *See* Order Setting Conditions of Release, *United States v. Burger*, No. 1:25-cr-332, ECF No. 104 (W.D. Tex. Dec. 29, 2025). So the issue raised by the government—whether the district court abused its discretion by releasing Burger on personal recognizance—is moot because "it is impossible for [the Court] to grant any effectual relief." *United States v. Heredia-Holguin*, 823 F.3d 337, 340 (5th Cir. 2016) (en banc).

Undeterred, the government argues that its appeal is not moot "because the district court lacked jurisdiction to issue the third release order," which released Burger on strict conditions. Gov't Br. 39. But the government has not appealed that order, so this

Court lacks jurisdiction to review it. "It is well settled that the requirement of a timely notice of appeal is mandatory and jurisdictional." *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 61 (1982). The government claims that "to determine whether the third release order moots the second, this Court must address whether the third release order was … null and void." Gov't Br. 41 (cleaned up). Not surprisingly, the government cites no authority for this convoluted argument. That's because it gets the law backwards. This Court is a court of limited jurisdiction, not an unconstrained tribunal searching for potential errors in the record. Unless the government files a notice of appeal properly bringing the order releasing Burger with conditions before this Court for review *and* this Court vacates the order, that order remains the operative release order. Since the government has not done so, this Court has no authority to review it.

Suppose this Court were to vacate both the order releasing Burger on personal recognizance (even though that issue is moot) and the recent order releasing Burger on strict conditions (even though the government never appealed). Even then, the district court has made it clear that it will, on remand, release Burger with strict conditions again. *See* Dec. 29 Hr'g 58–59. And that is the relief

that the government, in its own words, has "consistently sought" through its flurry of emergency motions: "Burger's detention *or carefully supervised and conditional release*." Gov't Reply in Supp. of Emergency Mot. to Vacate 6, ECF No. 71 (emphasis added). This Court should not waste judicial resources issuing an advisory opinion that will have no practical effect on this case, especially when the government has received exactly what it asked for.

## III. There is no basis for this Court to exercise its extraordinary and rarely invoked power to reassign this case to a different district judge.

If this Court reverses the dismissal of the indictment and remands for trial, it should reject the government's request to reassign this case to a different district judge. Reassignment is an extraordinary and rare remedy—one that is nowhere near warranted here. Contrary to the government's disparaging portrayal of a biased judge with fixed views, the record reflects a diligent district judge that carefully considered a close question and stands ready to preside over a fair trial if this Court determines that he got it wrong.

### A. Standard of review.

"The standard for reassignment presents a high hurdle." *United States v. Stanford*, 883 F.3d 500, 516 (5th Cir. 2018). That is because reassignment is "an extraordinary power and should rarely be invoked." *United States v. Winters*, 174 F.3d 478, 487 (5th Cir. 1999). This Court reassigns a case to a different district judge only "with the greatest reluctance." *Id.* (cleaned up).

The Court applies "two separate, but related" tests to analyze whether reassignment is warranted. *United States v. Khan*, 997 F.3d 242, 248–49 (5th Cir. 2021). The first involves weighing three factors:

(1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected,

(2) whether reassignment is advisable to preserve the appearance of justice, and

(3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

*Winters*, 174 F.3d at 487. The second asks whether reassignment is necessary to "avoid bias or the appearance of bias." *Id.* Because this

41

simpler test is "nearly identical" to the second factor of the first test, the Court usually analyzes the two tests together and the "result of each test has always been the same." *Khan*, 997 F.3d at 249 n.4.

### B.  The district judge carefully considered an admittedly close question.

Although the government claims the district judge is fixed in his views and doubts his impartiality, the record reflects the opposite. The record reflects a diligent judge who carefully considered a difficult issue, tried his best to get it right, and acknowledged that the government could appeal his decision to this Court.

The district judge admitted that this was a "difficult case." ROA.625; *see* ROA.715 ("I've struggled with this case for obvious reasons."). Indeed, the district judge said that this was "the most difficult case" he had handled. ROA.712. So he "spent more time thinking about this case than [he has] ever spent thinking about anything else [he has] done on the bench." ROA.704–05. The judge "worr[ied] about what the right thing to do in this case is," and he stated that he was "doing [his] best to try to get it right." ROA.705; *see* ROA.641 ("I want to do this the right procedural way."). He repeatedly highlighted the "extraordinary work" that the attorneys on both sides did "both in terms of the written advocacy and the oral

advocacy." ROA.717; *see* ROA.711 (telling government's counsel: "you've done a phenomenal job of arguing and helping me"), 715 ("Compelling arguments by both counsel, compelling briefs by both counsel."). The district judge ultimately dismissed the indictment, but he emphasized "how close [he] thought this case was." ROA.715–16. And he immediately stated that "[o]bviously the government has every right to ascertain whether [he was] wrong." ROA.716. The judge emphasized that a government appeal "absolutely would in no way offend [him]." ROA.716. As he told the government: "You all need to do whatever you think is appropriate to protect the government's rights in this case. And I'll be on the sidelines waiting to see what happens whatever the decision is." ROA.717.

In short, "reassignment would be inappropriate in light of the district court's fairhanded, thorough handling of the thorny issues before it." *See Stanford*, 883 F.3d at 517. The government may disagree with the district judge's decision to dismiss the indictment, but "judicial rulings alone almost never constitute a valid basis for finding bias or partiality." *M.D. v. Abbott*, 119 F.4th 373, 386 (5th Cir. 2024) (cleaned up).

### C.   None of the relevant factors warrant reassignment.

None of the factors that this Court weighs when deciding whether to reassign a case to a different district judge come remotely close to supporting reassignment here.

### 1.   The district judge is not fixed in his views but rather assured the parties that he would follow this Court's decision.

The government claims that the district judge is "fixed in his view of what the result of this case should be." Gov't Br. 45 (cleaned up). Not so. The district judge repeatedly assured the parties—and this Court—that it would respect this Court's decision on both the First Amendment issue and the release issue:

- "[W]hatever the Fifth Circuit says for me to do, I'm going to do. You know, I am an inferior court." Dec. 29 Hr'g 25.

- "I want to make sure the Fifth Circuit understands if— whatever they do, if they say I was wrong to dismiss the indictment, they're the superior court and I will faithfully execute a trial and do the best I can to try and protect the defendant's constitutional rights and to make sure the government can put on a fair case." *Id.* at 27.

- "[T]he Fifth Circuit can tell me I'm wrong." *Id.* at 38.

- "If I'm wrong, I will sign an arrest warrant as soon as I have the mandate from the Fifth Circuit saying that I'm wrong." *Id.* at 43.

Thus, the record is clear the district judge is *not* fixed in his views.

To support its baseless claim that this district judge would have difficulty putting aside his views, the government cites a few out-of-context statements and actions by the district judge. But none of these instances is prejudicial or suggests that the district judge has fixed views.

*First*, the government cites the district judge's offhand comment that "if we go to trial, the jury would never know this, but if I were on the jury, I would acquit him." Gov't Br. 43 (quoting ROA.641). Context is important. The district judge made this comment in the middle of an exchange about whether he should decide the First Amendment issue as a matter of law or let it go to the jury. *See* ROA.641–42. In any event, "a judge does not show bias merely because he has formed and expressed an opinion, in light of the evidence before him, regarding a plaintiff's ability to prove [its] case." *Raborn v. Inpatient Mgmt. Partners, Inc.*, 352 F. App'x 881, 884 (5th Cir. 2009). Indeed, it is only natural for a judge to form some opinions about a case and the parties during the proceedings. *See Liteky v. United States*, 510 U.S. 540, 550–51 (1994). Nothing about this cherry-picked comment casts doubt on the district judge's assurance that he would "faithfully execute a trial" and "make sure the government can put on a fair case." Dec. 29 Hr'g 27.

*Second*, the government notes that "[w]hen this Court intervened on an emergency basis to stay an order releasing Burger unconditionally, the district judge issued another order releasing Burger unconditionally the next day." Gov't Br. 44. But that action was explicitly allowed by this Court's order, which stated that "[t]he entry of this temporary administrative stay does not affect any relief that the district court may provide pursuant to 18 U.S.C. § 3143," the provision governing release or detention pending appeal. *See* Unpub. Order 1, ECF No. 28-1. And while the government quibbles with the judge's decision to release Burger unconditionally at that point, *see* Gov't Br. 44, a party "can't complain that the district court seemed biased merely because it ruled against [it]," *SEC v. Barton*, 135 F.4th 206, 229 (5th Cir. 2025).

*Third*, the government claims that the district judge "took over a [detention] hearing scheduled by a magistrate judge." Gov't Br. 44. But the government never explains why the district judge deciding this issue rather than the magistrate judge was somehow improper. Under the Bail Reform Act—and the federal judicial system generally—a district court possesses "the ultimate decision-making power and continuing jurisdiction over the actions of magistrate judges." *United States v. Cisneros*, 328 F.3d 610, 616 (10th Cir. 2003);

*see United States v. Maull*, 773 F.2d 1479, 1486 (8th Cir. 1985) (en banc). Indeed, Burger moved under 18 U.S.C. § 3145(b) to revoke the magistrate judge's earlier detention order. *See* Mot. to Revoke Detention Order 1, *United States v. Burger*, No. 1:25-cr-332, ECF No. 98 (W.D. Tex. Dec. 23, 2025). That statute *requires* the motion to be filed with and heard by "the court having original jurisdiction over the offense"—here, the district court. 18 U.S.C. § 3145(b). And although the district judge "released Burger again," Gov't Br. 44, it imposed strict conditions, *see* Order Setting Conditions of Release, *United States v. Burger*, No. 1:25-cr-332, ECF No. 104 (W.D. Tex. Dec. 29, 2025). That the district judge had earlier released Burger unconditionally but then released him on strict conditions confirms that he is willing to revisit his opinions—not that his views are fixed.

*Fourth*, the government argues that the "district judge repeatedly cut off the government's attempts to offer the testimony of an FBI agent." Gov't Br. 44. Again, the government ignores the context. The district judge reiterated that it would let the government question the FBI agent about "any additional evidence that is not already in the record." Dec. 29 Hr'g 16–17, 30, 31, 33. But he also explained that he was "familiar" with the case, *id*. at 16, so he did not need the FBI agent to read each exhibit—most of which were already in the

record—from the witness stand, *see*, *e.g.*, *id*. at 17 ("I've read it. …
[U]nless you have something this gentleman knows that is in
addition to what is on the screen, you can move on."); *id*. at 31 ("You're
asking him to discuss what's in the exhibits which I'm aware of."); *id*.
at 33 ("I don't need to hear him tell me what is in the exhibits that
I've reviewed."). These kind of "ordinary efforts at courtroom
administration" fall well short of warranting reassignment. *See Test
Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 581 (5th Cir. 2005)
(quoting *Liteky*, 510 U.S. at 556).

*Finally*, the government cites the district judge's concern that
reversing and remanding would result in an "impossible trial." Gov't
Br. 44–45 (quoting Dec. 29 Hr'g 25). But the government omits—
again—crucial context. The district judge was concerned that agents
did not read Burger his *Miranda* rights during a nearly 12-hour
interview (*see supra* 8–9), which led the government to agree not to
introduce the interview in its case-in-chief (*see* ROA.405) while still
maintaining that the interview was voluntary and could be
introduced in other contexts (*see* ROA.405, 621–23; Dec. 29 Hr'g 28–
29). The district judge recognized that this state of affairs—entirely
of the government's own making—will present "problems in
providing a fair trial." Dec. 29 Hr'g 25–29. That's true no matter who

the district judge is. And the government never explains why this judge's legitimate concern about "trying to guarantee the defendant's constitutional rights to a fair trial and everything that the Constitution provides," *id.* at 26, requires reassignment.

### 2. There is no basis to question the district judge's impartiality.

The government next claims that "reassignment is advisable to preserve the appearance of justice, and an objective observer would question the district judge's impartiality." Gov't Br. 45. Although the government may assume the worst about this district judge, this Court "will not assume the worst, nor would an objective observer." *Willey v. Harris Cnty. Dist. Att'y*, 27 F.4th 1125, 1137 (5th Cir. 2022). Rather, this Court "decline[s] to reassign absent a showing of bias or antagonism indicating that the judge would refuse impartially to weigh evidence or make objective decisions on remand." *United States v. Andrews*, 390 F.3d 840, 851 (5th Cir. 2004). The government cannot point to any hint of bias or antagonism in the record.

*First*, the government cites the same handful of statements it relied on to support the first factor. *See* Gov't Br. 45. As just explained, however, those unobjectionable statements do not come close to showing that the district judge was biased. *See supra* 45–49.

*Second*, the government cites the district judge's suggestion that Burger may have a selective prosecution argument. Gov't Br. 45 (citing ROA.643). But this Court has held that a district judge expressing "candid views" about the government's charging decisions does not warrant reassignment. *See United States v. Bowen*, 799 F.3d 336, 359 (5th Cir. 2015) ("That Judge Engelhardt expressed his candid views about the government's highly disparate charges between cooperating defendants and those who exercised their right to a jury trial does not provide grounds for removal.").

*Third*, the government notes that the district judge "questioned the credibility of the government's attorney" based on his response to a question. Gov't Br. 45 (citing Dec. 29 Hr'g 53). But that is no basis to doubt the district judge's impartiality. The district judge was very complimentary of the government's attorneys. *See* ROA.676–77, 711, 715, 715. That the judge considered the answer to a single question—whether the government objected to Burger attending church services with his grandfather—"disappoint[ing]," Dec. 29 Hr'g 53, is a far cry from the kind of "hostile remarks" and "brazen antagonism" that this Court has held warrant reassignment, *Khan*, 997 F.3d at 249 (first quote); *Andrews*, 390 F.3d at 851 (second quote). Indeed, allowing a party to request reassignment just because that

party's attorney has damaged his credibility with the presiding judge would create perverse incentives.

### 3. Reassigning this case to a new district judge would waste judicial resources.

Finally, the government argues that "reassignment would not entail waste and duplication." Gov't Br. 45. But this district judge "spent more time thinking about this case than [he has] ever spent thinking about anything else [he has] done on the bench." ROA.704. That includes issues that would be important if this case is remanded for trial, like whether and in what context Burger's un-*Mirandized* interrogation may be admissible. *See supra* 8–9. Courts understandably recognize the "benefit in remanding [a] case to the same district judge that has a thorough understanding of the facts present in [the] case." *United States v. McReynolds*, 69 F.4th 326, 336 (6th Cir. 2023). Given this district judge's deep familiarity with this case, reassignment "would be highly inefficient and wasteful of judicial resources." *See Barton*, 135 F.4th at 229.

## CONCLUSION

The Court should affirm the district court's order dismissing the superseding indictment and dismiss the government's appeal of the district court's second release order as moot. If the Court remands for further proceedings, it should decline to reassign the case to a different district judge.

Respectfully submitted.

MAUREEN SCOTT FRANCO
Federal Public Defender

s/ Carl R. Hennies
CARL R. HENNIES
Assistant Federal Public Defender
Western District of Texas

*Attorney for Defendant-Appellee*

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMIT

1. This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 10,627 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Century Schoolbook in body text and 13-point in footnotes.

s/ Carl R. Hennies
CARL R. HENNIES
*Attorney for Defendant-Appellee*

January 12, 2026